UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| JOSEPH F. SPEARS | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: 10-325-GFVT |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| AMAZON.COM.KYDC LLC | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Joseph H. Spears claims that Defendant Amazon.com.KYDC LLC. wronged him on the way in and again on the way out of its employ.  Spears maintains that Amazon fraudulently induced him to accept a position of employment in the company, or at least that Amazon negligently misrepresented the nature of the compensation to him.  Further, he asserts that Amazon inappropriately terminated him on the basis of his disability, in retaliation for his workers' compensation claim, and in transgression of public policy.  Amazon responds with this motion for summary judgment, wherein it argues that the claims advanced by Spears are without merit and asks this Court to render judgment as a matter of law in its favor.  For the reasons that follow, Amazon's motion for summary judgment will be DENIED in part and GRANTED in part.

I

In June of 2008, Joseph Spears was in the job market and was, at least in his view, a commodity that was in high demand.  His employment search lead him to apply at Amazon, with whom he entered negotiations for a position as a service technician.  Spears primarily interacted with Amazon's agent and recruiting coordinator, Kathy Bush.  Initially, Bush made Spears an unofficial offer that he ultimately rejected as insufficient.  In his deposition, he reports that the unofficial offer contained "an hourly wage and stock options," though his memory fails him as to the specific amount. [R. 35-5 at 6].

On June 17, 2008, Spears attended an interview with another company, Intelligrated, for a similar position.  After the interview and while discussions were apparently still ongoing with Intelligrated, Bush again contacted Spears and made a second offer.  Spears indicates that though he, again, does not remember the specifics of the offer, the amount of salary and stocks were increased, but he still considered the offer to be "deficient from where I would like to be."  [R. 35-5 at 7].  Even so, Spears testified that each time Bush offered him the position, she would make statements like, "if you only understood how much you stand to make off of these stocks," suggesting the stocks were more valuable than Spears realized.  [R. 35-5 at 8].

Shortly after this subsequent offer by Amazon, which Spears again refused, Intelligrated contacted him.  According to Spears, Intelligrated communicated that they "liked [him] and wanted [him] to come work for them," but they didn't "officially get to any real offer."  [R. 35-5 at 8].  The parties vigorously dispute whether Spears was actually in a position to take a job with Intelligrated.  Spears himself has provided some mixed signals about the nature of these negotiations, claiming that he turned down an Intelligrated job with a higher starting salary, but

also conceding that the company had not made him a formal offer and never said to him, "Hey, we're going to give you this much." [R. 35-5 at 8].  In his deposition, Spears said he could not remember if Bush had used the 504 restricted stock units (RSU) number in their first conversation or their last [R. 35-5 at 8]; however, in his supplemental affidavit he expressly states that he "declined the imminent job opportunity that was being extended to me at Intelligrated (which I testified to during my deposition) primarily because it apparently involved relocation to New Jersey, but also because I was aware of, and substantially influenced by, the fact that Amazon was offering me employment in Kentucky with terms that included more than 500 shares of stock…" [R. 37-1 at 2].  Either way, Spears did not become an employee of Intelligrated, though he testified that Intelligrated represented that they might have "something available possibly soon" in the central Kentucky or Cincinnati region.  [R. 35 at 28].

Though Spears is uncertain at which point before his final conversation with Intelligrated Amazon offered him 504 RSU,  the record is clear that by letter dated June 19, 2008 Amazon formally offered Spears a position as a service technician that included a specifically enumerated amount of stock options.  According to Amazon's letter, Spears would be paid at a rate of $22.00 per hour and was also set to receive the following compensation:

> Subject to approval by the Board of Directors, you will be granted a restricted stock unit award with respect to 504 shares of Amazon.com, Inc. common stock.  Subject to your continued employment with the company this award will vest and convert into shares of common stock on the 15th day of the month in which you reach your second anniversary of employment.

Spears states that he, "relied upon the representation contained in Amazon's letter of June 19, 2008….particularly the representation that [he] would be granted 504 shares of stock…on deciding to begin and continue [his] employment with Amazon, and that [he] stopped

investigating and pursuing other available job opportunities." [R. 37-1 at 2]. Whatever the reason, Spears began his employment with Amazon on July 7, 2008.

Amazon states that shortly after hiring Spears the company realized that there was a problem with his compensation package. Representatives of Amazon provided deposition testimony that pre-established RSU ranges existed for employees, including those classified as Service Tech II. [*See,* R. 35 at 9]. Recruiting Coordinators like Bush would use a computer system provided by Global Calculator to generate the RSU number from these predetermined ranges for compensation packages. Then, other Amazon employees review the compensation offers made by the recruiting coordinators. On August 13, 2008, Eric Nicholson, Director of Amazon's Benefits and Stock Plan Services, reviewed the contract and via email and informed members of the compensation team that the RSU amount for Spears was very high for his level of position, and as a result at least this portion of the compensation package was not submitted to the board of directors for approval. [R. 35 at 11].

Spears was informed of the mistake on December 5, 2008 in a letter that stated as follows:

> Through a routine audit of new hire RSU grants by our stock team, we recently discovered that the number of Restricted Stock Units ("RSU") stated in your offer letter (504) is not accurate. All stock grants must be approved by the Board of Directors, and the inaccurate stock grant will not be approved by the Board.
>
> The number of RSUs issued with new hire grants varies with position, location, and stock price at the time of hire. The average RSU grant for all Service Tech I and IIs hired since January 1, 2007, is 40 shares, with most grants in the 20 to 120 range, depending, again, on the position, location, and stock price at the time of hire.
>
> Accordingly, we are correcting your stock grant to issue 120 RSUs. These will vest on the same schedule described in your Offer Letter.

4

> We apologize for this error and any inconvenience it may cause you. To help ease the inconvenience, we are also providing you with a one-time $500 cash bonus. This bonus will be paid with your December 26th paycheck and will be grossed up to cover applicable taxes.

[R. 32-1 at 6].  Notably, the letter indicated to Spears that his stock grant was "not accurate," as the average grant of stock for his position was 464 shares lower than the amount he had been offered.  [*Id*].  Amazon remains unclear as to the cause of this inaccuracy, but suggests possible human or computer error with the Global Calculator program.  [R. 32-1 at 5].  The letter continued that "the inaccurate grant of stock will not be approved," but because of the mistake the company would provide him an amount of stock at the upper end of the predetermined appropriate range.  [*Id*].

In spite of the compensation error, Spears continued to work for Amazon, and according to the company's records he did so to its satisfaction for over a year.  [R. 32-12].  However, beginning in March of 2010, Amazon records three instances of counseling Spears as to his job performance.  [R. 32-12].  On June 23, 2010, Spears's employment file contains documentation of an incident wherein Spears received counseling and a warning for improperly leaving work early without ensuring that his preventative maintenance duties were covered.  [R. 32-9].  Overall, for 2010-2011 Spears was received a performance review rating of "needs improvement." [R. 32-12].

On November 4, 2010, Spears filed suit against Amazon in Pulaski County Circuit Court alleging breach of contract and promise, negligent misrepresentation, and fraud by Amazon in relation to the July 19, 2008 offer for employment.  On December 2, 2010, Amazon properly removed the case to federal district court, and soon thereafter filed a motion to dismiss.  [R. 1].

5

By Memorandum Opinion and Order dated November 26, 2011, this Court dismissed Spears's claims for breach of contract and promissory estoppel as well as claims advanced under KRS 337.060. [R. 10]. However, the Court found Spears's tort claims for negligent misrepresentation and fraud to be plausible on the face of the complaint and allowed them to continue.

Spears maintains that on November 28-29, 2010, in the same month that he filed his claim against Amazon, he became disabled as a result of a work related injury sustained from standing on a lift for an extended period of time. Specifically, Spears references four physical limitations that include tendinitis, plantar fasciitis, hammer toe, and a knot on his ankle, which caused him to be off work for a period of time. These limitations ultimately prompted Spears to file a workers' compensation claim, about which there is much disagreement in the record. In his deposition, Spears testifies that he made Amazon aware of his injuries and mentions his participation in the "workmen's comp process" and interaction with Bernita Townsend, "who was in charge of the workmen's comp stuff." [R. 35-5 at 14]. According to Amazon, Spears's involvement with the workers' compensation process was a result of a claim that he filed. In fact, internal documents from Amazon suggest its belief that Spears was ultimately "denied 3 work compensation claims." [R. 35-9].

Spears disputes Amazon's characterization of his claim for workers' compensation, and insists that he has "made one and only one workers' compensation claim while employed by the Defendant." [R. 35 at 20]. Spears states that he submitted an initial claim for workers' compensation benefits for medical costs and lost work to Amazon, who notified the Department of Workers' Claims of its administrative denial of such claim on February 16, 2011. Spears then appealed Amazon's denial, and retained an attorney on May 11, 2011 to prosecute his workers'

compensation claim.  [R. 35 at 30-31].  He has submitted an affidavit of that attorney who states under oath that she filed a formal workers' compensation claim on behalf of Spears with the Kentucky Labor Cabinet on April 3, 2012, and that prior to that time "Plaintiff did not have a workers' compensation claim in litigation," of which she was aware. [R. 35-8].  Either way, all parties acknowledge that Spears has filed a formal workers' compensation claim that remained pending at the time of the filing of the motion for summary judgment.

On May 6, 2011, after Spears had returned to work, Amazon states that he was "observed leaving the break room during his break, walking into the facility and clocking back in, and then immediately returning to the break room where he remained for another 20 minutes." [R. 32-1 at 8].  The Amazon "Owner's Manuel and Guide to Employment" states an expectation that employees "leave for and return from these breaks when scheduled," with no grace period permitted. [R. 32-8 at 5].  The employee manual classifies "failure to adhere to starting time, quitting time, or break time policies, or wasting time," as category two infractions, which are "considered serious and generally result in corrective action."  [R. 32-8 at 3-4].  "Falsely altering a timekeeping document," is a category one infraction which the employment manual classifies as being "extremely serious, and termination of employment may result."  [R. 32-9 at 3].  The manual provides for progressive discipline for abuse of time clock punches and that, "a pattern of early entries or late departures is not considered an attendance infraction but instead a behavior issue," for which the manual prescribes a corrective action warning and then, if continued, further discipline up to and including termination.  [R. 32 at 5].

Spears notes that he refused to sign the corrective action notice on May 9 and maintains that it was not warranted because he had only returned to the break room to attempt to use the

telephone to help repair an outage at the plant.  [R. 35 at 38].  Further, Spears claims that even if

he would have engaged in this activity, it would have only constituted a category two infraction,

and would not have been sufficient for termination.  [R. 35 at 19].  Amazon's personnel

documents, however, indicate that Spears left the break room with his cigarette still burning in

the ash tray and lunch on the table, and he returned to both after clocking back in.  [R. 32-12 at

2].  The company further records that in an interview conducted shortly after the infraction,

Spears indicated that he did not remember taking a phone call in the break room that day.  [R. 32-

12 at 3].  Amazon argues that Spears's activity on May 6 constituted falsifying a timekeeping

document, a category one infraction, and at minimum it was abuse of time clock punches, for

which Spears was given a final corrective action warning.

       According to Amazon, the corrective action warning was unavailing in prompting Spears

to alter his behavior at the workplace.  Amazon alleges that between July and August of 2011

Spears was involved in four violations involving the abuse of his break.  The company's

personnel documents indicate that on July 16, 19, and 30, 2011, as well as August 1, 2011,

Joseph Spears again engaged in unauthorized breaks. [R. 32-12 at 6].  Spears argues that he

believed himself to be using his personal time to properly extend his breaks.  However, in

Amazon's view, he was again engaging in falsification of a timekeeping document.

       An internal memorandum dated August 4, 2011, indicates that Karen Hoffman and

Bernita Townsend, both senior officers in the company's human resources department, contacted

Austin Clary of employee relations to discuss Spears's unauthorized break infractions.  [R. 35-9].

 The memo indicates that the three discussed the May 24, 2011 final written warning, the July 29

and August 1, 2011 video footage, additional time clock issues, the three workers' compensation

8

claims, and the pending lawsuit with Amazon.  [*Id*].  At the conclusion of the memorandum,

Hoffman and Townsend recommended proceeding with the termination and "Austin agreed and

supports termination based off the above information."  [*Id*].  It appears that Townsend then

completed a personnel document that summarized Spears's infractions, and recommended his

termination.  [R. 32-12].  One day later, on August 11, 2011, Spears was terminated from his

employment at Amazon.  Ali Green, the facilities manager who ultimately terminated Spears,

submitted an affidavit stating that, though she was aware of Spears's workers' compensation

claims and his lawsuit against the company, she "made the decision to terminate Joseph Spears

for continuing to take unauthorized breaks after having been previously warned not to do so."

[R. 32-14].

On February 29, 2012, Spears moved to amend his complaint asserting that Amazon

inappropriately terminated him on the basis of his disability, in retaliation for his workers

compensation claim, and in retaliation for filing this lawsuit.  The Court permitted the

amendment, and Amazon responded with the summary judgment motion that is currently

pending before this Court.

II

When sitting in diversity, a federal court applies the substantive law of the state in which

it sits.  *Hayes v. Equitable Energy Resourcs Co*., 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon*

*Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941)).  However, when considering the issue

of summary judgment, a federal court applies the standards of Fed.R.Civ.P. 56 rather than

"Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr.*

*Inc*., 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co*. 997 F.2d 150, 165 (6th Cir. 1993).

9

Under Rule 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

In deicing a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden is initially on the moving party to inform "the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may make this showing by demonstrating the absence of evidence to support one of the essential elements of the nonmoving party's claim. *Id*. at 322-25. Once this burden is met, the nonmoving party, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Further, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Instead, "the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

III

A

Amazon first argues that the Court should grant summary judgment in its favor as to Spears's fraud in the inducement claim.  To establish a claim for fraud in the inducement under Kentucky law, a party must prove the following six elements by clear and convincing evidence: "a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. App. 2010) (citing *United Parcel Service Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999)).  Moreover, "a misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." *Id.* (quoting *Filbeck v. Coomer*, 182 S.W.2d 641, 643 (1944)).  However, "One may commit 'fraud in the inducement' by making representations as to his future intentions when in fact he knew at the time the representations were made that he had no intention of carrying them out[.]").  *Id.*  (quoting *Major v. Christian County Livestock Market*, 300 S.W.2d 246, 249 (Ky. 1957)).

In its previous motion to dismiss, Amazon argued that its offer could not be a false representation due to the conditional language in the letter.  However, this Court found that in spite of this language "it is certainly plausible that the conditional stock grant could be read as a representation that Spears would likely receive 504 shares of Amazon stock if he came to work at Amazon and met the vesting requirement."  [R. 10 at 9].  Further, this Court found, "Because of the value of the shares and the context in which they were referenced (an employment offer), the representation's high level of materiality is also plausible." *Id*.  Amazon does not seem to directly

11

raise these issues afresh in its present motion, but for the same reasons as previously articulated, a reasonable juror could similarly find that the offer might be read as a material representation that Spears would likely receive 504 shares of stock if he accepted the offer of employment with Amazon.

The main element attacked by Amazon in its motion for summary judgment concerns whether the representation made by Amazon in the offer letter was false and whether it was made with knowledge or reckless disregard of its falsity. Because the offer in question was for a future grant of stock options, at issue is whether Amazon intended to give Spears the 504 RSU at the time they were offered to him. More specifically, the parties dispute over whose knowledge is the relevant focus of the analysis. Amazon asserts that Spears is unable to make out a legal claim for fraud in the inducement because Kathy Bush, the recruiting coordinator and human resources assistant with whom Spears negotiated, did not make a representation to Spears that she knew was untrue at the time she made it. Spears does not dispute that Bush made the offers to him in good faith, but counters that it is the knowledge of Amazon, not Bush, that is relevant to the fraud determination.

In support of its position that Kathy Bush's knowledge is determinative, Amazon makes a lone citation to *Bear, Inc. v. Smith*. In that case, the Kentucky Court of Appeals upheld the dismissal of the plaintiff's fraud claim against an individual on a similar basis to the one argued by Amazon. However, Amazon's quotation of *Bear, Inc.* demonstrates why it is distinct from the present matter: "Because Laker Express has failed to show that Tony H. Smith *and Smith Services* never intended to pay the respective fuel charges at the time they were incurred, Laker Express cannot establish that its claim meets the exception to the fraud rule involving

12

misrepresentations as to future intentions. Consequently its fraud in the inducement claim fails."
[R. 32-1 at 13 (quoting *Bear, Inc*., 303 S.W.3d at 144) (emphasis added)].  The court also stated
that, "Laker Express produced no evidence that Tony H. Smith, *or any agent of Smith Services*,
knew at the time that Smith Services incurred various unpaid fuel charges on its account that
Smith Services would not, in fact, pay Laker Express." *Bear, Inc*., 303 S.W.3d at 143 (emphasis
added).  In *Bear, Inc*., the Plaintiff sued the individual who had made the representation, and also
presented no evidence that the company or its other agents had any knowledge in contradiction to
that representation when it was made.  In this case, Spears does not sue Bush, but Amazon,
which Spears claims did have knowledge through its agents that the representation was false at
the time it was made.

Spears's argument that Amazon's knowledge is the relevant focus of the analysis is
somewhat more compelling.  Spears begins by arguing that because of Bush's agency, when she
sent the offer letter, Amazon itself had effectively represented to Spears that if he would come
work for them, the company would likely compensate him with 504 shares of stock.  [R. 35 at
14] (citations omitted).  Spears continues that at the same time that this representation was made,
other agents of the company knew of pre-determined ranges which effectively limited the amount
of stock available to an employee in Spears's position to 120 RSU, which constructively gave
Amazon the same knowledge.  [*Id.*] (citing *Arnett v. Stephens* 251 S.W. 947 953 (Ky. App.
1923).  Therefore, in Spears's view, on June 19, when Amazon said that Spears would likely
receive 504 shares of stock if he entered its employ, Amazon knew that Spears would be very
unlikely to receive this much stock.  As a result, Spears maintains that he has shown that a
reasonable juror could find that his claim meets the exception to the fraud rule involving

13

misrepresentations as to future intentions.

However, the Court need not decide this issue of Kentucky law at the summary judgment stage because Spears has more clearly created a genuine issue of material fact as to whether or not Amazon made the offer to Spears in reckless disregard of its falsity.  As previously stated, the element in dispute may be met if the representation made was false and "known to be false or made recklessly." *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. App. 2010) (citing *United Parcel Service Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999)); *See also*, *Cresent Grocery Co. v. Vick,* 240 S.W. 388, 389 (Ky. 1922) (stating that an action for fraud could be maintained if the representation was made, "recklessly, without any knowledge of its truth and as a positive assertion…").

All parties rightly agree that the manner in which Amazon communicates offers for employment is through agent recruiting coordinators like Kathy Bush. Kentucky has adopted the entity theory of corporations, under which corporations are considered a distinct legal entity. *May v. Sullivan*, 188 S.W.2d 469, 470 (Ky. 1945).  However, "A corporation must act through its officers and agents."  *Enterprise Foundry & Machine Works v. Miners' Elkhorn Coal Co*., 45 S.W.2d 470, 473 (Ky. 1931) (cited favorably by *Statewide Environmental Services, Inc., v. Fifth Third Bank*, 352 S.W.3d 927 (Ky.App. 2011)).  "Where an officer of a corporation is held out by it as authorized to represent the corporation in any particular act…that corporation is bound by his acts, even if the board of directors takes no specific action upon the matter and enters no formal order authorizing such officer to act for the corporation in that particular matter."  *Id.* This is one reason that the Court's previous Memorandum Opinion and Order states, "Because the June 19th letter is from an agent of Amazon, the letter, in a very real sense came from

14

Amazon." [R. 10 at 6]. Therefore, when Bush sent the offer, Amazon itself effectively made the representation to Spears that if he would come to work for them, they would likely compensate him with 504 shares of stock.

According to Bush, in generating the compensation packages for the offers, "you just put the job code into this particular template and it would tell you how many restricted stock units that person was supposed to get." [R. 35-3 at 10-11]. Amazon maintains that it is still unclear as to why Spears was assigned an inaccurate number of stock, but a representative of the company suggests the errant 504 RSU amount may have resulted from "both a malfunction of Global Calculator and an operator error on the part of Ms. Bush." [R. 32-1 at 5]. In its reply, Amazon seems to suggest that this could not be fraud because it was merely an isolated error. [R. 36 at 3].

However, Spears has produced evidence that suggests that the error might have been larger and more institutional than Amazon has represented. First, Spears produces an email from Eric Nicholson, Director of Benefits and Stock Plan Services, which states as follows:

> Attached is a list of 10 new hire grants that we are removing from the slate this month to allow time to research the grant amount. I have added a 'notes' column in the spreadsheet indicating the reason for removing them from the slate. In this case they were all removed because the number of shares appears to be too high for this level. There was mention that the comp tool might have been calculating incorrect value. Do any of you have more detail on this?"

[R. 35-2]. Thus, the problem experienced by Spears was not an isolated occurrence and was at least at some point believed to be the result of an error in the program used to generate the stock grants.

Spears develops the issue further with a variety of quotations to the deposition testimony of Kathy Bush, the recruiting coordinator who negotiated with Spears. When asked how the

15

incorrect stock grant was offered to Spears, Bush acknowledged that she had been blamed but stated that, "My understanding is that the cause of the problem was that the Global Calculator link was broken." [R. 35-4 at 103]. She continued to state that she received an email from the person responsible for the Global Calculator system who explained that the computer program "wasn't working correctly," and that the offers did not meet certain criteria, of which Bush had not been made aware." [R. 35-4 at 104]. Bush claims that she deleted that email because she was "angry" that she had been left in the dark about this criteria and that she "didn't have the equipment to be making these offers." [*Id*]. She testified that even though she had been making offers for around three years, much of the process had been unknown to her, many of the resources had been unavailable, and she "should have got some more coaching earlier on." [R. 35 at 49-50].

Bush was authorized to provide positive factual assertions on behalf of Amazon that the company would provide certain compensation. However, Spears has produced evidence that suggests that Bush was totally reliant on a computer system, which she either had not been trained to use properly, or which was known to be prone to error, or both. Further, he has shown that this combination may have resulted in at least ten erroneous offers, one of which was ten times the actual stock grant the company intended to offer. A reasonable juror could extrapolate from these facts that Amazon, speaking through Bush, made an offer to Spears that it had no reliable basis in fact to believe it would ever grant him. In other words, Spears has created a genuine issue of material fact as to whether Amazon was reckless because its systemic failures placed Bush in a position in which she was commissioned to make a certain positive assertion to Spears "without any knowledge of its truth." *Cresent Grocery Co. v. Vick,* 240 S.W. 388, 389

(Ky. 1922).

The parties do not seem to dispute that when Amazon offered Spears the stock options, it was attempting to induce him to agree to enter an employment relationship with the company. However, Amazon does argue that Spears has failed to demonstrate that he detrimentally relied on the stock offer representation. Amazon highlights portions of Spears's deposition testimony wherein he states that he was never officially offered another job at Intelligrated or elsewhere before he accepted the position with Amazon. In Amazon's view, without a competing job offer, Spears cannot prove that he detrimentally relied on the inaccurate amount of stock because he did not give up anything in reliance on Amazon's representations.

"In Kentucky, a claimant may establish detrimental reliance in a fraud action when he acts or fails to act due to fraudulent misrepresentations." *Rickert,* 996 S.W.2d at 469 (citing *Sanford Construction Co. v. S & H Contractors, Inc.*, 443 S.W.2d 227, 232 (1969)). Under this standard, Kentucky courts have found detrimental reliance in circumstances where a potential employee is "defrauded by a potential employer who knowingly made misrepresentations to him for the purpose of inducing him to forgo another job opportunity." *Brown v. Louisville Jefferson County Redevelopment Authority, Inc*., 310 S.W.3d 221, 225 (Ky.Ct.App. 2010). However, Kentucky courts have also held that "a person is entitled to damages resulting from inaction when an untrue statement is made with the intent to induce that person from acting so long as it can be demonstrated that the false statement produced the inaction." *Rickert*, 996 S.W.2d at 469, ("Rickert presented evidence that his reliance on the representation by UPS caused him not to look for employment with other airlines…and consequently he lost seniority and benefits because of his failure to obtain other employment sooner.").

17

In his deposition testimony, Spears does not definitely recall when stocks in the amount of 504 shares were offered to him, but he does consistently state that in each negotiation Bush always implored him to recognize the value of the stock options in making his decision.  Spears maintains that Intelligrated was interested in his services throughout their interaction, and that it was only after he told Intelligrated he did not want to live in New Jersey that the negotiations stalled.  Thus, Spears has consistently represented in his testimony and affidavits that it was he who effectively terminated the discussions with Intelligrated before it could result in a firm offer for potentially higher pay.  A reasonable juror could interpret this evidence to show that even though Spears may not have wanted to move to New Jersey, he might have been willing to do so if he didn't believe that there was an offer waiting for him back home in Kentucky that Amazon had indicated was substantially enriched by the high number of stock options.

At the very least, Spears has consistently stated that he was actively searching for a job at the time of his negotiations with Amazon.  When he accepted the offer given him by Amazon, Spears, like Rickert, "stopped his job search preparations in reliance on what he believed to be the offer."  *Rickert*, 996 S.W.2d at 469.  Specifically, Spears states that he did not follow up on Intelligrated's indications that they might have "something available possibly soon" in the central Kentucky or Cincinnati area, because of the representations made by Amazon.  [R. 35 at 28]. This evidence of inaction in not further seeking employment opportunities with Intelligrated, or perhaps even other potential employers, also suggests a genuine issue of material fact as to detrimental reliance, precluding summary judgment.

Spears submitted an affidavit subsequent to his deposition, which directly states that he knew the amount of stocks that had been offered him by Amazon when he interviewed with

Intelligrated, and in reliance on the stock options he declined an "imminent job opportunity" with Intelligrated and "stopped investigating or pursuing other available job opportunities." [R. 37-1 at 2]. Amazon believes this to be inconsistent with Spears's deposition testimony, and perhaps after vigorous cross examination and impeachment of Spears at trial, a jury will agree. However, Spears has brought forth evidence that he was engaged in an active and fruitful employment search that he discontinued to take a job at Amazon for an amount of stock he never received. Further, he testified that he had some indication of the value of the stocks at the time of his interview with Intelligrated, and this knowledge might have influenced his decision to terminate the discussions for employment with Intelligrated in New Jersey and not wait to see if any opportunities opened up with the company in Kentucky. These facts, like those related to Amazon's recklessness at the time of the representation, remain in dispute, and as a result summary judgment is not appropriate for Spear's fraud in the inducement claim

B

The Court need not labor long at responding to Amazon's attack on Spears's claim for negligent misrepresentation because, as recognized by the briefs of the parties, the only expressed issue of contention concerns reliance, which has been previously discussed in the context of the fraud in the inducement claim. Kentucky courts define the elements of a negligent misrepresentation claim by citing to the Restatement (Second) of Torts § 552:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

19

*Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky. 2004) (quoting RESTATEMENT (SECOND) OF TORTS § 552).  Thus, both parties recognize that in order to succeed on a claim for negligent misrepresentation, a plaintiff must be able to prove that he or she justifiably relied on the representations made by the defendant.  The same evidence raised by Spears to create a genuine issue of material fact as to whether he detrimentally relied on Amazon's stock offer in the fraud context, leads to the same result as to the justifiable reliance element of the negligent misrepresentation claim.  As a result, judgment as a matter of law is not appropriate for Spears's negligent misrepresentation claim.

IV

Amazon's final three arguments seek to refute Spears's various wrongful discharge claims.  Kentucky recognizes the common law "terminable at will" doctrine that, "ordinarily an employer may discharge his at-will employees for good cause, for no cause, or for a cause that some might view as morally indefensible."  *Grzyb v. Evans*, 700 S.W.2d 399, 400 (Ky. 1984) (citing *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)).  However, the Kentucky Supreme Court has adopted a "narrowly defined exception" to the "terminable at will doctrine" that provides a cause of action for wrongful discharge.  *Id*.  The exception has been triggered in cases that, "involved public policy which was clearly defined by statute and directed at providing statutory protection to a worker in [the plaintiff's] employment situation."  *Id*.  The Kentucky Supreme Court has also set forth the following limitations on any judicial exceptions to the "terminable at will doctrine":

20

1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.
2) That policy must be evidenced by a constitutional or statutory provision.
3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Id.* (citing *Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 835 (WI 1983).

Spears claims that Amazon triggered the exception to the "termination at will" doctrine when it wrongfully discharged him in retaliation for his workers' compensation claim, on the basis of his disability, and in transgression of other public policy considerations. Amazon counters that each claim should be disposed of in summary judgment. The Court shall consider the claims in turn.

A

Kentucky courts have long recognized a public policy exception to the "terminable at will" doctrine when the discharge is in retaliation for an employee's claim for workers' compensation. *See Firestone*, 666 S.W.2d at 734 ("the only effective way to prevent an employer from interfering with his employees' right to seek compensation is to recognize that the latter has a cause of action for retaliatory discharge when the discharge is motivated by the desire to punish the employee for seeking [workers' compensation] benefits to which he is entitled by law."). This exception was codified in KRS § 342.197(1), which states that, "No employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under this [worker's compensation] chapter."

In support of his claim, Spears dutifully applies the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This is likely because in at least one

21

case the Kentucky Court of Appeals employed a similar burden shifting framework to analyze a workers' compensation retaliation claim. *See Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915-16 (Ky.Ct.App. 2006). However, a slightly more recent case from the same court noted that, "Kentucky courts have never explicitly applied the *McDonnell Douglas* test in the context of a workers' compensation retaliatory discharge claim," and they "do not expressly endorse this approach given more directly relevant authority interpreting KRS § 349.197." *Bishop v. Manpower, Inc., of Cent. Kentucky*, 211 S.W.3d 71, 75 (Ky.Ct.App. 2006). *See also, Hodge v. Dollar General*, No. 09-119-DLB, 2011 3880486 at *8 (E.D.Ky 2011) (collecting cases).

Instead, the Sixth Circuit has described the analysis used by Kentucky courts in considering a claim under KRS § 349.197(1) as follows:

> Under Kentucky law, the 'minimum' burden on a plaintiff claiming retaliation is to provide evidence she (1) 'engaged in statutorily protected activity,' (2) was discharged, and (3) 'there was a connection between the protected activity and the discharge.'

*Henderson v. Ardco, Inc*., 247 F.3d 645, 654 (6th Cir. 2001) (citing *Willoughby v. GenCorp*, 809 S.W.2d 858, 861 (Ky.Ct.App.1990)). *See also Bishop*, 211 S.W.3d at 75. Importantly, to have engaged in a protected activity, the worker need not have filed a formal workers' compensation claim, it is sufficient that he is "pursing a lawful claim for workers' compensation benefits." *Overnite Transp. Co. v. Gaddis*. 793 S.W.2d 129, 132 (Ky.Ct.App. 1990).

Though there is much debate over when Spears filed his workers' compensation claim, all parties agree that Spears began pursuing workers' compensation benefits before he was terminated and Amazon was aware of the claim or claims that he was pursuing. Further, it is beyond dispute that Amazon took an adverse employment action against Spears when it

22

terminated his employment.  The issue that remains is whether the adverse action is causally connected to Spears's pursuit of his workers' compensation claim such that the discharge was wrongful.

In Kentucky, to demonstrate a connection between the adverse action and the workers' compensation claim, a plaintiff need not prove that the protected activity was the sole or even primary motivating factor inciting the action, but that pursuit of the workers' compensation claim was "a substantial and motivating factor but for which the employee would not have been discharged." *Henderson*, 247 F.3d at 654 (citing *First Property Management v. Zarebidaki*, 867 S.W.2d 185, 188)).  *See also Follett v. Gateway Regional Health System, Inc.,* 229 S.W.3d 925, 929 (Ky.Ct.App. 2007); *Bishop,* 211 S.W.3d at 76; *Chavez v. Dakkota Integrated Systems*, LLC, 832 F.Supp. 2d 786, 801 (W.D.Ky 2011).

Amazon attacks the nexus between the discharge and the workers' compensation claim by stating that, "the sole evidence that the Plaintiff presents is that he was discharged nine months after he filed his claim for benefits," and this is insufficient temporal proximity to establish a causal connection.  [R. 32-1].  However, counter to Amazon's representations, Spears is not without evidence that his workers' compensation claim played a motivating role in the decision to terminate his employment.  Spears produces an internal memorandum dated August 4, 2011, wherein Karen Hoffman and Bernita Townsend, both senior officers in the human resources department, document their conversation with Austin Clary, of employee relations.  [R. 35-9].  The memorandum lists the various employment infractions for which Spears had been cited.  In addition, the memorandum also notes that "Joseph has been denied 3 work compensation claims."  [R. 35-9].   At the conclusion of the memorandum, Hoffman and

23

Townsend recommend proceeding with the termination and "Austin agreed and supports termination *based off the above information*." [R. 35-9 (emphasis added)]. Within the next week Spears was terminated from his employment at Amazon.

Amazon downplays the significance of this memorandum stating that it merely indicates that the members of the company were aware that Spears had filed workers' compensation claims. While this may ultimately be proven true, that is an issue for a jury to decide, not the Court at the summary judgment stage. For the present, Spears has produced a memorandum that a reasonable juror could interpret as a listing of the factors that motivated the company to terminate him, one of which was his workers' compensation claims. In so doing, Spears has created a genuine issue a material fact as to whether the workers' compensation claim was a motivating factor in his termination, precluding summary judgment.

This is true even if Spears abused his breaks in violation of Amazon's policies, subjecting him to discharge on the basis of a legitimate non-retaliatory employment reason. Amazon advances copious documentation as to Spears's misdeeds as an employee in order to provide a legitimate justification for the termination. Based on the number and nature of the infractions in Spears's personnel file, set out more fully in the factual recitation above, it is quite reasonable to believe that Amazon terminated Spears because he was a lazy and unproductive employee who at least failed to adhere to company break policies and at worst fraudulently manipulated company time keeping documents. However, in the workers' compensation context, the Kentucky Supreme Court has been clear that "the employer is not free from liability simply because he offers proof he would have discharged the employee anyway, even absent the lawfully impermissible reason, so long as the jury believes that the impermissible reason did contribute as

24

one of the substantial motivating factors.*" Zarebidaki*, 867 S.W.2d at 188.  As stated by a sister court in this district, "In other words, regardless of Defendant's reason for the adverse employment action, so long as Plaintiff can prove that his pursuit of a workers' compensation claim was a substantial and motivating factor in the adverse employment action, he can defeat summary judgment." *Hodge v. Dollar General*, No. 09-119-DLB, 2011 3880486 at *8 (E.D.Ky 2011).  Through the presentation of the August 4, 2011 memorandum, Spears has done just that, and therefore his workers' compensation retaliation claim survives this stage of the litigation.

B

Amazon next argues that wrongful discharge claim on the basis of a disability should be dismissed because Spears is not disabled and has not proven that he was terminated on the basis of a disability.  Like workers' compensation retaliation, a public policy exception against discharge as a result of disability has been codified by Kentucky statute.  Kentucky's Equal Opportunity Act ("KEOA"), KRS § 207.150(1), states:

> No employer shall fail or refuse to hire, discharge, or discriminate against any individual with a disability with respect to wages, rates of pay, hours, or other terms and conditions of employment because of the person's physical disability unless the disability restricts that individual's ability to engage in the particular job or occupation for which he or she is eligible, or unless otherwise provided by law…

KRS § 207.130(2) defines "physical disability" under KEOA as the "physical condition of a person whether congenital or acquired which constitutes a disability to that person and is demonstrable by medically accepted clinical and laboratory diagnostic techniques."  One who is not physically disabled by this standard may not recover for wrongful discharge on the basis of a disability pursuant to KRS § 207.150(1).

25

Though Spears initially claimed that his discharge was related to his development of tendinitis, plantar fasciitis, hammer toe, and a knot on his ankle, he concedes in his response to Amazon's motion for summary judgment, "in light of the evidence of record, the workplace injury he had developed while working at Amazon is not yet sufficiently restrictive in his major life activities to qualify as a disability." [R. 35 at 45-46]. Without a physical disability as defined under KEOA, Spears cannot "make a showing sufficient to establish an essential element" of his claim for wrongful discharge on the basis of a disability and judgment as a matter of law may be entered in favor of Amazon. *Celotex Corp*., 477 U.S. at 322.

C

Finally, Amazon challenges Spears's third wrongful discharge claim, which, although somewhat unclear, seems to allege retaliation for filing this lawsuit. As previously stated, the public policy exception to the "terminable at will doctrine" is narrowly drawn and with the exception of one caveat, which does not apply on these facts, to establish a claim Spears must point to a public policy which is clearly defined by statute and directed at providing statutory protection to a worker in his employment situation. *Grzyb*, 700 S.W.2d at 400. Amazon argues that the Court should dismiss this wrongful discharge a claim because Spears fails to identify a qualifying well defined public policy evidenced by constitutional or statutory provision in support of his claim.

Spears responds, in summary fashion, by claiming that his original suit contained claims under KRS § 337.060, permitting a cause of action for "stock fraud." [R. 35 at 46]. He reasons that to the extent Amazon was retaliating against him on the basis of his suit under this statute, he was wrongfully discharged. However, KRS § 337.060 cannot support his public policy claim

because the Court has already found that this statute does not apply to the facts of Spears's case. Since KRS § 337.060 is inapplicable and Spears has pointed toward no other statute, no genuine issue of material fact remains as to his claim for wrongful discharge in violation of public policy, and summary judgment shall be entered in favor of Amazon.

V

Accordingly, for the aforementioned reasons, it is hereby **ORDERED** as follows:

1.      Amazon's Motion for Summary Judgment [R. 32] is **DENIED**, as to Spears's claims for fraud in the inducement, negligent misrepresentation, and workers' compensation retaliation; and

2.      Amazon's Motion for Summary Judgment [R. 32] is **GRANTED**, as to Spear's claims for wrongful discharge on the basis of a disability and in violation of public policy.

This 12th Day of February, 2013.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**